UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

AUG 3 0 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

JANINE PERRY,                          )
                                       )
    Plaintiff,                     )
                                       )
v.                                     )   No. 08-cv-1216 (RCL)
                                       )
HILLARY RODHAM CLINTON,                )
                                       )
    Defendant.                     )
_____ )

## MEMORANDUM OPINION

Before the Court is defendant's Motion for Summary Judgment. Def.'s Mot. Summ. J.

[64]. Also before the Court is plaintiff's Motion for Leave to File Sur-Reply Opposition to

Defendant's Motion for Summary Judgment, Pl.'s Mot. Leave [74], plaintiff's Motion *in Limine*

No.1, Pl.'s Mot. Limine [78], and defendant's Motion *in Limine* to Exclude Certain Evidence at

Trial. Def.'s Mot. Limine [79]. Having carefully considered the Motions, the Oppositions, the

Replies, oral argument of counsel, the entire record in this case, and the applicable law, the Court

will grant defendant's Motion for Summary Judgment, and deny plaintiff's Motion for Leave to

file a sur-reply[1], plaintiff's Motion *in Limine*, and defendant's Motion *in Limine* as moot. A

review of the background of the case, the governing law, the parties' arguments, and the Court's

reasoning in resolving those arguments follows.

## I.    FACTUAL BACKGROUND

Plaintiff Janine Perry, who is African American and female, has worked for the

Department of State for over twenty years. Like many Department employees, she began her

---

[1] Ms. Perry's Motion for Leave to file a sur-reply will be denied. Sur-replies are rarely permitted, and only "when a party is 'unable to contest matters presented to the court for the first time' in the last scheduled pleading." *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003). Ms. Perry states that her sur-reply is justified because the Department stated for the first time in its Reply that it was challenging whether a retaliation claim based on Ms. Weston's 2005 desk audit of Ms. Perry's position was timely exhausted. Pl.'s Sur-Reply Opp'n [74-1] 1. This is incorrect. The Department very clearly makes this argument in its Motion for Summary Judgment. Def.'s Mot. Summ. J. [64] 39–40.

career on the lower rungs of the government's pay scale and worked her way up, her duties and job title changing periodically. She began working for the Department before the advent of the internet, and took up website-management duties in the '90s as a GS-7 Editorial Assistant. Def.'s SMF [64] ¶33.

In 2003, Ms. Perry was a GS-11 "Program Coordinator" in a division of the Department called the Bureau of International Information Programs ("IIP"). IIP itself had several subdivisions, and Ms. Perry worked in one called the "Office of Western Hemisphere." She was still mostly performing website-management duties at that time. Her first-line supervisor was Dominique DiPasquale. At some point in 2003, she approached Mr. DiPasquale about getting a promotion to the GS-12 level. He consulted with Cynthia Scriber of Human Resources, who created a new "Website Manager" position classified at the GS-12 level to facilitate Ms. Perry's promotion. *Id.* at ¶7. However, since this new position would be "non-competitive"—i.e., Ms. Perry was the only person who would get the job—Human Resources decided to limit its promotion potential, capping it at GS-12. *Id.* Ms. Perry had held "full performance level" positions in the Department before, and she accepted the GS-12 Website Manager position knowing that it had a full performance level of GS-12. *Id.* at ¶6. Other, non-capped and competitive positions for which she could have applied were available at the time but she apparently didn't apply for them. *See* Def.'s Ex. 6, Yemelyanov Decl. [64-3] ¶15.

The fact that Ms. Perry's new GS-12 position lacked promotion potential was a topic of some discussion between her and Mr. DiPasquale, as he approached the sweet release of retirement. She was likely concerned that once he departed, there would be uncertainty about her ability to obtain promotions beyond the GS-12 level. However, during these discussions, Mr. DiPasquale never promised her that her position would be upgraded to a GS-13 after he retired, and Ms. Perry knew that it wouldn't be solely in her new supervisor's power to make her a GS-

13, even if he or she happened to agree with Ms. Perry on that topic. Def.'s SMF [64] ¶12; Def.'s Ex. 1, Perry Dep. [64-2], at 65:2–3. Mr. DiPasquale himself doubted whether Human Resources—within a year of creating a non-competitive position to facilitate Ms. Perry's promotion to GS-12—would go along with the creation of yet another one, this time to make her a GS-13. Def.'s Ex. 4, Transcript (1/17/08) [64-2], at 246: 8–14. He thought the most likely path for Ms. Perry would be a "desk audit," where a Human Resources employee would scrutinize her actual day-to-day responsibilities to see if she deserved an upward adjustment in grade level. *Id.* at 246:15–16.

In August 2003, Mr. DiPasquale did retire and Ms. Perry got a new first-line supervisor: Gerard Joria. Def.'s SMF [64] ¶4. While Mr. DiPasquale and Ms. Perry seemed to have gotten along fairly well, it's clear that Mr. Joria's and Ms. Perry's work relationship began awkwardly and grew more strained as time passed. For example, within a week of Mr. Joria's reporting for duty, he was rummaging around in a storage closet at the office and came across a "burn bag"— i.e., a bag of papers intended to be discarded—that contained an Equal Employment Opportunity complaint that Ms. Perry had filed in 1999 against her former supervisor, William Bach (Mr. DiPasquale's immediate predecessor). Pl.'s Ex. 27, Transcript (1/17/08) [66-27], at 26:15– 27:21. At that point Mr. Joria learned that Ms. Perry had filed an EEO complaint several years before. Pl.'s Ex. 8, Transcript (1/16/08) [71-8], at 431:4–11. It's unclear from the record whether Mr. Joria did more than just read the caption on the complaint, or whether he even knew that the complaint was made against a predecessor.

Further awkwardness ensued in September 2003 when Mr. Joria, whose job it was to review employees' reimbursement requests, confronted Ms. Perry about some "inaccuracies" in an expense report she had submitted, where she had sought reimbursement for cab fares taken during a trip to Denver for a conference. Mr. Joria suspected that Ms. Perry might not have

actually taken all of the cab rides for which she sought reimbursement from the government. Def.'s Ex. 12, Joria Dep. [64-6], at 133:11–134:12. But he didn't want to file disciplinary charges as his "first act [] with a subordinate." *Id.* at 180:3–5. After this meeting, Ms. Perry revised the request and Mr. Joria approved it as revised, telling her in a note that they would "just put this behind us" because the whole matter might have been caused by a "misunderstanding" about the reimbursement rules. *Id.* at 15:5–9.

Friction increased between the two later that year when Mr. Joria became dissatisfied with Ms. Perry's work habits. Apparently he was perturbed when she was absent from her post for too long during the work day. Pl.'s Ex. 8, Joria Dep. [71-8], at 52:1–22. At some point he confronted her about a 2.5-hour absence from work during the middle of the day, which was apparently not "the first time she was missing for long periods of time . . . ." *Id.* at 52:12–14. He also appears to have had some trouble getting in touch with her when she was "telecommuting" or working from home. *Id.* He temporarily took away her telecommuting privileges because he felt she was "abusing the privilege." *Id.* at 56:12–13.

These somewhat trivial workplace issues were the backdrop for a major dust-up beginning in the summer of 2004 between Ms. Perry and her entire management over the issue of whether she should receive a promotion to the GS-13 level. In April or May 2004, Ms. Perry approached her first-line supervisor, Mr. Joria, about obtaining the promotion. She told him about an understanding she believed she had with her prior supervisor, Mr. DiPasquale, concerning her promotion to GS-13 after his retirement. Def.'s Ex. 1, Perry Dep. [64-2], at 98:18–25. It's not clear what the outcome of this first Perry–Joria meeting was. Then, in May or June 2004, Ms. Perry went to Human Resources, where she learned that she was the only IIP

website manager at the GS-12 level; the other four were GS-13's.[2] Pl.'s Ex. 6, Perry Dep. [71-6], at 100:4–6. According to Ms. Perry, she again approached Mr. Joria and asked him if he would "make my grade a 13," the same as the other website managers, and he refused. *Id.* at 102:4–5.

Following Mr. Joria's refusal, Ms. Perry returned to Human Resources, and with the help of an employee in that office, she prepared a draft position description that "would meet the GS-13 level" and that Mr. Joria, so her thinking went, would approve. Pl.'s Ex. 7, Transcript (1/16/08) [71-7], at 213:14–22. She felt that this draft position description "reflected the work that I currently performed." *Id.* at 213:20–21. On September 29, 2004, immediately upon receiving an edited version of this draft position description from the Human Resources employee, she presented it to Mr. Joria for his signature. *Id.* at 230:1–3. However, Mr. Joria felt that her description of her own duties was "seriously flawed" and he refused to sign off on it. Def.'s Ex. 21, Joria Decl. [64-13] ¶5. He asked her instead to identify duties she was currently performing that were *not* included in her current, GS-12-classified position description, and she was unable to do so. *Id.* at ¶6.

At this point, Mr. Joria told Ms. Perry that, because her current position was at the "full performance" level and had no promotion potential, there were only two avenues open to her if she wanted to be paid at the GS-13 level: (1) if there were a "business justification" to do so, a new GS-13 position could be created that she could actually compete for, or (2) Human Resources could perform a "desk audit" to determine whether she was in fact working at a grade level higher than that assigned to her position.[3] If so, a new position description could then be

---

[2] The five IIP website managers in 2004 were Ms. Perry (Office of Western Hemisphere), Juan Francisco DeLeon (same office as Ms. Perry), Timothy Receveur (Office of Europe, Asia Information), Paula Thomson (Office of Near East, South Asia), and Bruce Greenberg (Office of Africa).

[3] As noted above, plaintiff's prior supervisor, Dominique DiPasquale, thought a desk audit would be Ms. Perry's most likely route to a promotion given that her position was capped at GS-12. Def.'s Ex. 4 [64-2] 246:5–16.

prepared at the higher grade level (whether GS-13, 14, or otherwise) to reflect the additional duties that she had assumed. Def.'s SMF [64] ¶11; Def.'s Ex. 15, Gibson Decl. [64-9] ¶7. She would then receive what is called an "accretion of duties" promotion. Of course, one looming possibility was that the desk audit could reveal that Ms. Perry was performing at the correct—or even a lower—grade level.

Faced with these two choices, Ms. Perry first opted for a desk audit. Def.'s SMF [64] ¶14. GraTheryn [*sic*] Weston of Human Resources undertook the audit in January 2005. *Id.* Ms. Weston is of the same race and gender (African American and female) as Ms. Perry. *Id.* at ¶15. Using information that Ms. Perry provided to her, Ms. Weston initially decided that the duties she performed graded at the GS-11 level—that is, one grade *lower* than Ms. Perry's GS-12 "Website Manager" position was currently assigned. *Id.* at ¶16. It's unclear from the record why this process took so long, but five months later, in May 2005, Ms. Perry was notified about the preliminary GS-11 determination and given the opportunity to submit additional information about her work. *Id.* at ¶17. After taking this information into account, Ms. Weston made a final determination that Ms. Perry was working at the grade level assigned to her current position: GS-12. *Id.* at ¶18. Ms. Perry was notified about Ms. Weston's final determination in August 2005, where she was also told that she had the right to appeal Ms. Weston's decision if she thought it was a mistake. *Id.* at ¶19. She was also told that she could have someone other than Ms. Weston perform the desk audit again or review Ms. Weston's audit. Def.'s Ex. 1, Perry Dep. [64-2], at 139:6–8. Plaintiff did not, however, pursue any of these options. *Id.* at 139:14–15; Def.'s SMF [64] ¶20.

With the desk audit having shown that Ms. Perry's current responsibilities warranted GS-12 level pay, she tried the second option suggested by Mr. Joria nearly a year before: asking management to create a new GS-13 position that she could apply for. However, instead of going

to Mr. Joria first (who over a year ago had refused to change her grade to GS-13), Ms. Perry tried her second-line supervisor—and Mr. Joria's boss—Kathleen Davis. Def.'s Ex. 1, Perry Dep. [64-2], at 146:4–7. Ms. Davis, like Ms. Perry, is African American and female. *Id.* at 146:15–16. Ms. Perry asked Ms. Davis to create a new GS-13 Website Manager position that she could apply for. *Id.* at 145:18–24. Ms. Davis declined plaintiff's request. *Id.*

Despite these numerous ill tidings and the profound improbability of her obtaining the answer she was looking for, on October 6, 2005, Ms. Perry once again asked Mr. Joria to do what he had refused to do a year before and what his boss had just told Ms. Perry she wouldn't do: create a new GS-13 position for Ms. Perry. Def.'s SMF [64] ¶22. Predictably, Mr. Joria refused the renewed request, finding that there was no business justification for creating a new GS-13 position, particularly given that Ms. Perry's desk audit had just determined that she was performing GS-12 level work. *Id.* at ¶23.

The very next day, Ms. Perry contacted an EEO counselor. Def.'s Ex. 17, EEO Letter [64-11], at 1. She claimed that she was discriminated against on the bases of race and sex, and retaliated against for an "EEO complaint filed in about 2000 . . . ." *Id.* She claimed that "management" discriminated and retaliated against her "on a continuing basis since August 2004" by denying her a promotion to GS-13 by refusing to create a GS-13 position she could apply for. *Id.* She claimed that Mr. Joria discriminated and retaliated against her by denying certain training requests that she had made and by denying her requests for an Individual Development Plan. *Id.* In December 2005, Ms. Perry filed a formal EEO complaint, repeating her claim that she was retaliated against for her 1999 "EEO Complaint against former supervisor William Bach" and that she was discriminated against because "I am the only Website Manager who is at the GS-12 pay scale and all other Website Managers are GS-13. I am the only African-American." Pl.'s Mem. Opp'n Mot. Summ. J. [27], Ex. 2, EEO Complaint [27-2], at 1. While

there were other supervisors and employees involved in the determination that she would remain a GS-12 and that no new GS-13 position would be created for her, in the EEO investigation that proceeded the filing of her complaint in federal court, Ms. Perry only made allegations of discrimination against one manager: Mr. Joria.[4]  Def.'s SMF [64] ¶3; Def.'s Ex. 1, Perry Dep. [64-2], at 177:3–24, 182 ("Q: And the discriminatory and retaliatory actor against whom you are alleging these allegations was Mr. Joria. Is that right?  A:  Mr. Joria. That's all.").

Ms. Perry remained employed at the Department while her EEO complaint was pending. However, both prior to and after she filed her formal complaint of discrimination and retaliation at the agency level, the Department began taking steps to standardize, centralize, and automate functions that affected all of IIP's website managers. Def.'s SMF [64] ¶30. Beginning in 2003, she was relieved of some of her "coding and layout" responsibilities, which became centralized in a single office. Def.'s Ex. 9, Cachonas Decl. [64-5] ¶2. In late 2005, Ms. Perry lost some of her usual photo-editing responsibilities as well, as IIP automated those tasks to create a consistent look for images across all of its web pages. *Id.* at ¶3. Other IIP website managers lost those same duties. Def.'s Ex. 1, Perry Dep. [64-2], at 168:12–17. In 2006, to increase efficiency, IIP centralized the task of gathering and processing data on web trends, relieving Ms. Perry of that responsibility alongside other website managers. Def.'s Ex. 9, Cachonas Decl. [64-5] ¶4; Def.'s Ex. 1, Perry Dep. [64-2], at 168:24–169:2. IIP also relieved all website managers of responsibility for preparing and distributing something called the "Washington File," finding that it was "more efficient to have one employee prepare a single file for all embassies than to have five regional web editors prepare separate 'regional' files." Def.'s Ex. 20, Gomez Decl. [64-12] ¶2; Def.'s Ex. 1, Perry Dep. [64-2], at 170:18–24. Senior IIP management made these

---

[4] Ms. Perry disputes this fact, Pl.'s Resp. Def.'s Statement Material Facts [68] 2, but points to no evidence indicating otherwise. In her deposition, she indicated that others in human resources (GraTheryn Weston) "reinforced" Mr. Joria's discriminatory animus by "carrying out his views," Def.'s Ex. 1, Perry Dep. [64-2], at 140:19–22, but this is insufficient as an allegation of discrimination by persons other than Mr. Joria.

decisions, which affected all web editors for English language websites, not just Ms. Perry. *Id.* at ¶4; Def.'s SMF [64] ¶30.

In April 2006, Ms. Perry responded to these organizational changes by amending her EEO complaint, adding allegations that she had been discriminated against, and retaliated against, when management "stripped away" some of her work duties and assigned them to other employees. Def.'s Ex. 18 [64-11] 1–2.

Further changes in Ms. Perry's workplace began in November 2006, when IIP underwent a major reorganization. Def.'s SMF [64] ¶34. As part of the reorganization, Human Resources reclassified the positions of many employees within IIP, including Ms. Perry. *Id.* at ¶35. Because so many positions had to be reclassified, IIP hired contract classifiers to assist in the effort, and it appears that it took a couple of years for IIP to get around to reclassifying Ms. Perry's position. *Id.* In the meantime, her current "Website Manager" title was abolished and replaced with the title "Web Editor." Def.'s Ex. 1, Perry Dep. [64-2], at 182:15–17. In November 2006, while IIP went through its reorganization process, Ms. Perry was initially detailed as a web editor to the Office of Web Management. Def.'s SMF [64] ¶36. However, she requested a transfer out of that unit, and took up a new temporary assignment in the Office of Publication Services, under the supervision of Richard Huckaby. *Id.* at ¶37. In March 2009, she was formally assigned to that office as a GS-12 "Electronic Publishing Specialist." *Id.* at ¶38. A contract classifier who did not know Ms. Perry made the decision to classify her position as a GS-12 "Electronic Publishing Specialist," rather than a GS-13 "Electronic Publication Officer." *Id.* at ¶41; Def.'s Ex. 1, Perry Dep. [64-2], at 188:21–189:3.

On July 16, 2008, while still on detail as a web editor in the Office of Publication Services, Ms. Perry filed her original complaint in the U.S. District Court for the District of

9

Columbia, before Judge Henry H. Kennedy, Jr.[5] Compl. [1] 1. She sued Condoleeza Rice, former Secretary of the Department, in her official capacity for monetary damages and equitable relief. *Id.* She alleged that she was the victim of workplace discrimination on the basis of her "race, African-American, and/or gender, female," because she was paid less than "similarly situated white male and/or white female employees for performing substantially similar work." *Id.* at 1–2. She alleged that the Department engaged in a "pattern and practice" of paying "black and/or female" employees less than "non-black and/or male employees." *Id.* at 2. Finally, she claimed the Department retaliated against her for "her participation in EEO activity and her objection to practices in violation of the EEO laws." *Id.*

Ms. Perry's complaint raised two claims: (1) a discrimination claim pursuant to 42 U.S.C. § 2000e-16, that included a claim of pattern-and-practice discrimination, *id.* at 8; and (2) a retaliation claim pursuant to 42 U.S.C. § 2000e-3. *Id.* at 9. With respect to her retaliation claim, Ms. Perry alleged that the Department retaliated against her for (1) her 1999 EEO complaint involving her former supervisor, William Bach, for (2) her participation in the pending EEO action, and for (3) her verbal objections to various co-workers and managers that she was the only African-American website manager and the only person paid at the GS-12 level. *Id.* She pointed to four allegedly retaliatory acts: (1) Mr. Joria's "refus[al] to support her request for a GS-13" promotion; (2) the Department's refusal to increase her pay to match that of "her similarly situated while female co-worker, Paula Thomson"; (3) the Department's refusal of her training requests; and (4) stripping-away of some of her duties. *Id.*

In March 2009, the Department filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment. Def.'s Mot. Dismiss [11, 12] 1. The Department argued that Ms. Perry's wage discrimination claim should be dismissed for failure to exhaust administrative remedies.

---

[5] The case was reassigned to this Court in November 2009. Reassignment [33] 1.

*Id.* at 2. In particular, the Department argued that Ms. Perry had only exhausted a "failure to promote" claim, and not a wage discrimination claim. *Id.* The Department further argued that however Ms. Perry's discrimination claim was characterized, it failed because she couldn't "rebut as pretext defendant's legitimate, non-discriminatory reason for the employment decision at issue." *Id.* at 9. As to Ms. Perry's retaliation claims, the Department argued that she had failed to make out a *prima facie* case of retaliation because her protected conduct was too far removed in time from the Department's allegedly retaliatory actions to suggest a causal connection between the two. *Id.* at 3.

Also in March 2009, and with the Department's Motion to Dismiss pending, Ms. Perry amended her complaint, adding new retaliatory conduct to her retaliation claim: (1) the Department's refusal to reclassify her position to be equal to that of her co-worker, Chris Larsen, a white male, and (2) refusal of a request for advanced sick leave.[6] Am. Compl. [21] 11. These additional acts of retaliation were the subject of a meeting plaintiff had with an EEO counselor on March 2, 2009. Def.'s Ex. 19 [64-11] 1.

Since Ms. Perry had amended her complaint, Judge Kennedy denied the Department's Motion to Dismiss as moot. Order [23] 1, Apr. 30, 2009. In June 2009, the Department filed a new Motion to Dismiss, or, in the Alternative, for Summary Judgment [25, 26], largely on the same grounds as its prior motion. However, as to the new claims of retaliation added by Ms. Perry in her amended complaint, the Department argued that since those claims were first raised with an EEO counselor in March 2009 and because the EEO investigation had not come to an end, those new claims should be dismissed for failure to exhaust administrative remedies. Def.'s Mot. Dismiss [25] 5.

---

[6] Plaintiff was never actually denied advanced sick leave. Def.'s SMF [64] ¶44; Def.'s Ex. 1, Perry Dep. [64-2], at 196:2–18.

In December 2009, after the case was reassigned to this Court, the Court denied the Department's renewed Motion to Dismiss without prejudice, except as to Ms. Perry's pattern-and-practice discrimination claim, which the Court dismissed for failure to exhaust administrative remedies. Mem. Op. [35] 14. The case proceeded through discovery, and the Court set a June 2011 deadline for dispositive motions and a July 2011 trial date. Order [59] 1, May 3, 2011. In June 2011, the Department filed a Motion for Summary Judgment, Mot. Summ. J. [64], which became ripe for decision shortly before trial was set to begin. However, upon review of the parties' submissions, and following a hearing on July 18, 2011, the Court vacated the trial date and took the Department's Motion for Summary Judgment under advisement.

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The standard requires more than the existence of *some* factual dispute: "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (1986) (emphasis in original). A fact is a material fact if, under the applicable law, it could affect the outcome of the case. *Id.* A dispute is a genuine dispute for summary judgment purposes if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Also, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

A nonmoving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely

solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). The nonmoving party must present specific facts that enable a reasonable jury to find in its favor. *Id.* If the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

## III. TITLE VII CLAIMS

Before the Court is the Department's Motion [64] for Summary Judgment. As to Ms. Perry's wage discrimination claim, the Department argues that the difference in pay between Ms. Perry and those she claims are "similarly situated" to her has "nothing to do with discrimination," but is simply a race- and gender-neutral output of the Department's merit promotion system. Def.'s Mot. Summ. J. [64] 1. Her retaliation claims, the Department says, likewise fail either because Ms. Perry hasn't exhausted her administrative remedies or because she cannot establish a *prima facie* case of retaliation. *Id.* at 37–45. Ms. Perry generally retorts that a reasonable jury could find otherwise, arguing that purported problems with the Department's position-classification and desk-audit process reveal that the Department's proffered non-discriminatory reasons are merely pretexts for intentional discrimination. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 19. The Court will discuss these and other arguments in the analysis that follows.

### A. Legal Standard

Title VII of the Civil Rights Act states that employment decisions by federal employers must be "made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Title VII also prohibits retaliation against an employee because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). As a

prerequisite to filing suit in federal court, a plaintiff must first exhaust her administrative remedies.

### 1. Exhaustion of administrative remedies

A federal employee who believes that her agency discriminated or retaliated against her in violation of Title VII must seek administrative adjudication of her claim before filing suit in federal court. *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (making clear that both discrimination and retaliation claims must be timely exhausted); *see* 42 U.S.C. § 2000e-16(c). "A party must exhaust [her] administrative remedies within the Title VII limitations period for each discrete act of discrimination alleged or lose the ability to recover for it." *Lipscomb v. Winter*, 577 F. Supp. 2d 258, 271 (D.D.C. 2008) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–115 (2002)); *see also Wada v. Tomlinson*, 517 F. Supp. 2d 148, 183 (D.D.C. 2007) (stating that, under *Morgan*, "a Title VII plaintiff is required to exhaust his or her administrative remedies with respect to each discrete allegedly discriminatory or retaliatory act"), *aff'd* 296 Fed. Appx. 77 (D.C. Cir. 2008).

The Equal Employment Opportunity Commission has promulgated regulations that require the federal employee to first contact an EEO counselor to try to informally resolve the matter, and the employee must do so "within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. § 1614.105(a)(1). After this initial EEO contact, the employee must file an administrative complaint with her agency. *Id.* § 1614.106(a). The agency then conducts an investigation, and if requested by the employee, the matter is referred to an EEOC administrative judge for a hearing. *Id.* §§ 1614.106(e)(2), 1614.108–09. After the agency investigation, or decision of the EEOC administrative judge, the employing agency must take "final action." *Id.* § 1614.110. If the employee doesn't request an EEOC hearing, the agency's final action consists of "findings . . . on the merits of each issue . . . and, when discrimination is

found, appropriate remedies and relief. *Id.* § 1614.110(b). If the employee requests a hearing, then final action consists of the employing agency's "final order" which "shall notify the complainant whether or not the agency will fully implement the administrative judge's decision." *Id.* § 1614.110(a). At that point an aggrieved employee may appeal to the EEOC, or file suit in federal court pursuant to 42 U.S.C. § 2000e-16(c). In cases where no "final action" is taken within 180 days after the filing of the charge with the EEOC, an aggrieved federal employee may file a lawsuit in federal court. *Id.*; *Murthy v. Vilsack*, 609 F.3d 460, 464 (D.C. Cir. 2010). The 180-day waiting period is mandatory, as it promotes Congress's policy of "encouraging informal resolution up to the 180th day." *Murthy*, 609 F.3d at 464 (citations and quotation marks omitted).

## 2. Discrimination and retaliation

With regard to the substantive law governing Title VII cases, in cases where a plaintiff lacks direct evidence of discrimination or retaliation, her claims must be analyzed under the framework of *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), as simplified by the D.C. Circuit in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Under *Brady*, once an employer proffers a legitimate, non-discriminatory reason for a challenged employment action, the central question is whether the employee has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason wasn't the actual reason and that the employer intentionally discriminated against her on the basis of race. *Brady*, 520 F.3d at 494. In considering this question, the court may examine: "(1) the [employee's] *prima facie* case[7]; (2) any evidence the [employee] presents to attack the

---

[7] For a *prima facie* case of wage discrimination, a plaintiff must show membership in a protected class, and that she was performing work substantially equal to that of white [or male] employees who were compensated at higher rates than she was. *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999). To make out a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered a materially adverse action by her employer, and (3) a causal link connects the two. *Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011).

employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the [employee] . . . or contrary evidence that may be available to the employer." *Colbert v. Tapella*, No. 10-5047, 2011 WL 2417131, at *1 (D.C. Cir. Jun. 17, 2011) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). These principles apply equally to retaliation claims. *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

## B. Analysis

### 1. Exhaustion of administrative remedies

The Department argues that Ms. Perry has failed to administratively exhaust: (1) her wage discrimination claim, Def.'s Mot. Summ. J. [64] 21 n.13; (2) her retaliation claims to the extent that they relate to any allegedly retaliatory acts that took place prior to August 23, 2005, *id.* at 39–40; and (3) her retaliation claims to the extent that they relate to discrete claims of retaliation that Ms. Perry first raised with an EEO counselor in March 2009. *Id.* at 44. For the reasons discussed below, the Court concludes that Ms. Perry has timely exhausted her wage discrimination claim, but has failed to timely exhaust any retaliation claims related to allegedly retaliatory conduct that took place before August 23, 2005 as well as any retaliation claims related to allegedly retaliatory conduct that took place in March 2009.

#### a. Wage discrimination

The Department renews its argument, raised in earlier motions to dismiss, that Ms. Perry didn't timely exhaust a wage discrimination claim, but only a failure-to-promote claim. *Id.* at 21 n.13. However, this Court has already considered at length the question of whether Ms. Perry timely exhausted a wage discrimination claim. *See* Mem. Op. [35], Dec. 10, 2009, at 9–10. In the Court's prior Memorandum Opinion, it concluded that Ms. Perry's formal EEO complaint of discrimination alleged race and sex discrimination while explaining that she was the only

16

African-American website manager and the only person in that position paid at the GS-12 level instead of the GS-13 level. *Id.* at 9–10. The Court also determined, alternatively, that Ms. Perry's wage discrimination claim was "reasonably related" to the failure-to-promote claim she did exhaust. *Id.* at 10.

The Department's renewal of its argument is based upon a recent decision of the D.C. Circuit that notes a distinction between failure-to-promote claims and wage discrimination claims. *See Schuler v. PriceWaterhouseCoopers*, 595 F.3d 370, 374–75 (D.C. Cir. 2010). While this is informative, it doesn't disturb this Court's original conclusion regarding Ms. Perry's administrative exhaustion of her wage discrimination claim. That conclusion wasn't based upon a failure by the Court to recognize a distinction between failure-to-promote and wage discrimination claims, but upon a recognition that Ms. Perry's EEO materials said enough about her disparate compensation vis-à-vis other IIP website managers to constitute administrative exhaustion of a wage discrimination claim.

Therefore the Court, following its earlier ruling, finds that Ms. Perry has timely exhausted her wage discrimination claim.

### b. Retaliation before August 23, 2005

The Department argues that Ms. Perry was required to contact an EEO counselor no later than 45 days after any allegedly retaliatory acts, and that, by failing to do so with respect to a few discrete acts of alleged retaliation prior to August 23, 2005, Ms. Perry has failed to timely exhaust her administrative remedies as to those claims. Def.'s Mot. Summ. J. [64] 39–40. As stated above, a Title VII plaintiff must timely exhaust each discrete act of retaliation, or lose the ability to recover for it. *Wada*, 517 F. Supp. 2d at 183. EEOC regulations require that a complainant make contact with an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. § 1614.105(a)(1). Because Ms. Perry's initial EEO

contact took place on October 7, 2005, only allegedly retaliatory acts that took place within 45 days of that date—that is, on or after August 23, 2005—are candidates for timely exhaustion.

The record indicates that the following allegedly retaliatory acts took place before August 23, 2005:

(1)    Mr. Joria's refusal to create a GS-13 position for Ms. Perry ("May or June" 2004, Pl.'s Ex. 6, Perry Dep. [71-6], at 100:4–6);

(2)    Ms. Perry's formal notification that the desk audit performed by GraTheryn Weston of Human Resources graded her position at a GS-12 (August 7, 2005, Def.'s SMF [64] ¶19);[8] and

(3)    Mr. Joria's refusal to act on various training requests "beginning in 2004" (Def.'s Ex. 22, Perry Decl. [64-14] ¶18).[9]

Since Ms. Perry failed to make contact with an EEO counselor within 45 days of these events, she failed to exhaust her administrative remedies with respect to these retaliation claims and they will be dismissed.

To the extent that Ms. Perry is claiming that Kathleen Davis, her second-level supervisor, retaliated against her by refusing to create a GS-13 position for her sometime in August 2005, the Court finds that there exists a genuine issue as to the timeliness of Ms. Perry's EEO contact, since the record doesn't specify the precise date of her August meeting with Ms. Davis.

### c. Retaliation for March 2009 conduct

Ms. Perry's added claims of retaliation, related to her March 2, 2009 job reclassification and alleged denial of sick leave, also will be dismissed for failure to exhaust administrative

---

[8] While Ms. Perry doesn't dispute that she was advised of the final results of the desk audit on August 7, 2005, Pl.'s Response Def.'s SMF [68] 6, in her Opposition she suggests that the "ultimate rejection" of her promotion via a desk audit was on September 8, 2005, when GraTheryn Weston sent her an email containing the same information Ms. Perry received over a month before. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 12. While Ms. Perry did not support this statement with a citation to any evidence, the Court did locate an attachment to her Opposition containing an EEO counselor's report that presents Ms. Perry's account of having "received an e-mail" from Ms. Weston on September 8, 2005 stating the results of the desk audit. EEO Counselor's Report [66-60] 13. Setting aside the issue of whether an e-mail from Ms. Weston that simply repeats one month later what Ms. Perry was told on August 7, 2005 constitutes an additional act of retaliation, this statement in the EEO report contains two levels of hearsay and is inadmissible.

[9] This dismissal for failure to exhaust applies only to denials of training that occurred before August 23, 2005. Ms. Perry has exhausted claims for denial of training on or after that date.

18

remedies.  On March 2, 2009, Ms. Perry met with an EEO counselor concerning the Department's decision to classify her position as a GS-12 "Electronic Publishing Specialist" and its alleged denial of advanced sick leave, which occurred that same day.  Def.'s Ex. 19.  Less than three weeks later, and before filing a formal EEO complaint that included these new, discrete acts of alleged retaliation, Ms. Perry amended her complaint in this lawsuit, adding retaliation claims based upon the new conduct.  Am. Compl. [21] 11.  It appears that Ms. Perry didn't file a formal complaint with the agency until several months later.  Although she hasn't provided the Court with a date for when she filed her complaint with the Department's Office of Civil Rights, a letter dated September 15, 2009 shows that she must have done so at least by that date.  Letter [71-20] 1.  She also hasn't provided any evidence of subsequent proceedings, even though the Office of Civil Rights (as stated in the letter) must have acted on the charges within, at the latest, 360 days from filing of the complaint, a date that ticked by nearly two years ago.

Ms. Perry was required by EEOC regulations to file a complaint with that agency to seek administrative adjudication of her claim.  29 C.F.R. § 1614.106(a); *see Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010).  Furthermore, a Title VII complainant is required to "exhaust his or administrative remedies with respect to each discrete allegedly discriminatory or retaliatory act." *Wada v. Tomlinson*, 517 F. Supp. 2d 148 (D.D.C. 2007) (citing *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 (2002).  By adding clearly unexhausted retaliation claims to her complaint in this Court before beginning an administrative adjudication at the agency level,  Ms. Perry disregarded the Title VII requirement that claims for discrimination or retaliation must brought no earlier than 180 days after filing of an EEOC complaint.  29 C.F.R. § 1614.407(d).  Those claims must therefore be dismissed as untimely.

To the extent that Ms. Perry contends that she wasn't required to exhaust what she believes are retaliation claims "reasonably related" to retaliation claims brought in her 2005 EEO

investigation, the Court also finds that these March 2009 retaliation claims are not "reasonably related" to a filed charge under a line of cases that permits federal employees to litigate unfiled claims that are "like or reasonably related to" claims they did file with their agencies. *See Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). Ms. Perry's claims concerning retaliatory conduct that took place in March 2009 couldn't possibly have "arise[n] from the administrative investigation" that followed her December 2005 complaint, since that EEOC investigation concluded before those additional, allegedly retaliatory acts. *See Final EEOC Order [75-1] 1; see also Park*, 71 F.3d at 907; *Payne*, 619 F.3d at 65. The EEOC never had an opportunity to investigate these new claims before they were brought in federal court. Also, these new claims involve different conduct and a completely different cast of individuals than Ms. Perry's 2005 retaliation claims, Mr. Joria having long since retired and Ms. Perry's having moved to a new office in IIP. In short, there was no opportunity in the EEOC investigation that followed her 2005 EEO complaint to resolve *these* claims administratively before she filed them in this Court.

Therefore Ms. Perry's retaliation claims relating to her March 2009 reclassification and alleged denial of sick leave[10] will be dismissed for failure to exhaust administrative remedies.

## 2. Wage discrimination

Regarding Ms. Perry's Title VII discrimination claim, she claims that the Department discriminated against her "when it compensated her less for performing the same work as her non-black and/or non[-]female peers." Am. Compl. [21] ¶42. Her claim is for "disparate treatment"—that is, she believes that the Department treated her less favorably than others because of her race and gender. *See Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15 (1977). In disparate treatments cases, "[p]roof of discriminatory motive is critical, although it

---

[10] Alternatively, Ms. Perry's retaliation claim related to the alleged denial of her request for sick leave will be dismissed because the record shows that Ms. Perry was not, in fact, denied the sick leave that she requested. Ex. 1, Perry Dep. [64-2] 195:2–12

can in some situations be inferred from the mere fact of differences in treatment." *Id.* The latter

cases, however, "are rare," and require a "stark" pattern "unexplainable on grounds other than

race." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

### a. Pretext

The Department argues that any difference in grade level or pay between Ms. Perry and

those she claims are her comparators is due to legitimate, non-discriminatory reasons—namely,

"the legitimate operation of the merit promotion system, . . . choices Ms. Perry made as regards

her own career path, the evolving nature of the website manager position, differences between

the largely autonomous regional units within IIP that maintained their respective websites[,] and

differences in the website manager position within and among the regional offices." Def.'s Mot.

Summ. J. [64] 21. Because the Department has proffered legitimate, non-discriminatory reasons

for the difference between Ms. Perry's grade level and the grade level of those she believes are

similarly situated to her in the Department, this Court is required to consider the following

question: whether Ms. Perry has produced sufficient evidence for a reasonable jury to find that

the Department's asserted non-discriminatory reasons weren't the actual reasons and that the

Department discriminated against her on the basis of race or gender. *Brady*, 520 F.3d at 494.

The answer to this question is no. Ms. Perry's efforts to show pretext flutter ineffectually

between baseless charges of perjury by Department witnesses, equally baseless allegations of a

"cover-up," and generally involve a purposeful papering-over of clear differences between her

and those whom she claims were treated preferentially on account of gender or race.

Furthermore, throughout Ms. Perry's attempts to show pretext, the elephant in the room is the

absence of any evidence that any person with influence over her grade level was actually

motivated by racism or sexism. Indeed, many of those whose actions she now challenges were

of the same race and gender[11] as her, adding a thick layer of implausibility to her narrative. Below, the Court will briefly consider Ms. Perry's various arguments for why the Department's asserted non-discriminatory reasons are pretextual.

### i. Similarities between Ms. Perry and her alleged comparators

Ms. Perry challenges the Department's claim that the differences in pay between her and three colleagues with GS-13 grade levels—Francisco DeLeon, Timothy Receveur, and Paula Thomson—are merely the result of the Department's merit promotion system. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 29. She asserts that because she is "similarly situated" to these white employees but graded one level lower, the Department's asserted non-discriminatory reasons are "unworthy of credence." *Id.* at 13. Showing that similarly situated employees of a different race received more favorable treatment is one way to discredit an employer's proffered justification. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008). In order to do so, Ms. Perry must show that "all of the relevant aspects of her employment situation were 'nearly identical' to those" who were treated more favorably. *Id.*

The relevant aspects of Ms. Perry's employment situation are clear from examining her circumstances toward the end of 2005, when her request to be promoted to a GS-13 was refused by her management and a desk audit concluded that her work warranted a GS-12 grade level. At that time, Ms. Perry held the title of "Website Manager" in the Office of Western Hemisphere and was supervised by Gerard Joria. Her position did not require translation from or to a foreign language, nor did it involve writing articles or any other substantial original written content. Ms. Perry sought a GS-13 promotion toward the end of 2004. Since her position was at the full-performance level of GS-12, she asked her management to create a new GS-13 position that she

---

[11] Ms. Perry's Opposition doesn't address her gender discrimination claim in any way, and therefore her discrimination claim, to the extent that it is based upon gender, is dismissed. *See Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (holding that a court may treat as conceded any arguments raised in a dispositive motion that the plaintiff fails to address in her opposition).

could apply for. Under *Royall*, for Ms. Perry to show pretext, she must present evidence that shows that those persons whom she claims are her comparators are a very close match ("nearly identical") to her in all of these relevant respects, yet they received favorable treatment and she did not. 548 F.3d at 145. Ms. Perry has failed to do this.

First, Mr. DeLeon doesn't share many relevant aspects of Ms. Perry's employment situation. He had a different title than Ms. Perry: "Website Manager (Spanish)." In 2004, he did work in the same office as Ms. Perry (Western Hemisphere) and had the same supervisor (Mr. Joria), but when Mr. DeLeon sought a GS-13 promotion in 2001, his supervisor was Dominique DiPasquale, not Mr. Joria. Def.'s Ex. 6, Yemelyanov Decl. [64-3] ¶12. Mr. Joria, who Ms. Perry claims in the principal discriminatory actor, played no role at all in Mr. DeLeon's promotion and so couldn't have treated him preferentially on account of his race. Unlike Ms. Perry, Mr. DeLeon's job required the use of a foreign language, and he sought a promotion to the GS-13 level by competing for a vacant position that the Department had already created and advertised. *Id.* In short, Mr. DeLeon's higher grade level was achieved under very different circumstances than those in which Ms. Perry sought a GS-13 promotion in 2004. Therefore Mr. DeLeon is not similarly situated to Ms. Perry.

As to Timothy Receveur, he had the same title as Ms. Perry, but worked in a different office under a different supervisor. Def.'s SMF [64] ¶31. Mr. Joria (Ms. Perry's supervisor) wasn't involved in Mr. Receveur's promotion to GS-13 in 2002 and never supervised him. While, like Ms. Perry, Mr. Receveur's website manager position didn't require the use of a foreign language, his position required a substantial amount of original content creation, not just website manager duties; he wrote "numerous full-length articles" while employed as a website manager. Def.'s Ex. 13, Fenner Decl. [64-7] ¶4. Indeed, unlike Ms. Perry's website manager position, the one occupied by Mr. Receveur was created as a dual website manager/writer

position. *Id.* at ¶3. Also unlike Ms. Perry, Mr. Receveur achieved a promotion to the GS-13 level by competing for a vacancy in a position that had already been created by the Department. *Id.* In short, since Mr. Receveur's employment situation is different in relevant respects to Ms. Perry's, he is not similarly situated to her.

Finally, as to Paula Thomson, she held the same title as Ms. Perry, but worked in a different office under a different supervisor. Mr. Joria, again, wasn't involved at any level in Ms. Thomson's promotion in 2003 to GS-13. While Ms. Thomson's position didn't require translation, Ms. Thomson had "collateral responsibilities for writing articles," which Ms. Perry acknowledges was a difference between her job and Ms. Thomson's. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 7. The record contains evidence of articles Ms. Thomson wrote just prior to obtaining her GS-13 promotion in 2003. Def.'s Ex. 13, Fenner Decl. [64-7] ¶6. Ms. Perry, by contrast, has provided no examples of articles she has written for Department websites either before or after she became a GS-12 website manager in 2004. Also, unlike Ms. Perry, Ms. Thomson obtained her GS-13 promotion by competing for an already-created and vacant website manager position in her office. Def.'s Ex. 6, Yemelyanov Decl. [64-3] ¶14. Therefore, while Ms. Thomson's employment characteristics are more similar to Ms. Perry's than any other alleged comparator that Ms. Perry names, Ms. Thomson isn't "similarly situated" for purposes of showing pretext unless *all* of the relevant employment characteristics are nearly identical, and they are not. *See Royall*, 548 F.3d at 145.

In sum, as to each person Ms. Perry identifies as a comparator in her Opposition, no reasonable jury could conclude that they are similarly situated to her. Therefore, the fact that Ms. Perry's position was graded one level lower than that of other employees in IIP provides no evidence that the Department's proffered, non-discriminatory reasons for the resulting pay difference are pretexts for racial discrimination.

24

### ii. Mr. Joria's "impeached testimony" concerning Francisco DeLeon

As a separate ground for showing pretext, Ms. Perry points to the testimony of Gerard Joria at an EEOC hearing concerning the amount of Spanish translation performed by website manager Francisco DeLeon as a part of his job duties. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 16. Ms. Perry accuses Mr. Joria of "lying" when he testified that Mr. DeLeon's position description required him to spend at least 25 percent of his time translating. *Id.* at 17. However, Ms. Perry's accusation is not evidence, and she offers no evidence indicating that this apparent mistake was in fact a "lie." In any event, Mr. Joria corrected his testimony in that same hearing after he was given the opportunity to actually look at the document in question. Pl.'s Ex. 5, Transcript [65-5], at 451:20–22. Nor is this mistake about what Mr. DeLeon's position description actually said about his Spanish responsibilities particularly suspect given that Mr. DeLeon's title was "Website Manager (Spanish)" and his position description required him to "[c]reate[] and edit[] content for IIP's Spanish-language website" and have the ability to "write and/or translate into clear concise Spanish . . . ." Ex. 15 [64-9] at 8. Also, Mr. Joria's testimony concerning the amount of translation performed by Mr. DeLeon is consistent with the testimony of others, including Mr. DeLeon's prior supervisor, Dominique DiPasquale, who testified that Mr. DeLeon translated more than a third of the time. *See* Def.'s Ex. 4, Transcript (1/17/2008), at 231:14–15. Therefore, Ms. Perry's accusations of perjury not only lack merit but fail to discredit the Department's proffer.

### iii. The Department's "violations of law, regulation[,] and policy"

Ms. Perry's next attempt at showing that the Department's proffer is pretext involves a haphazard and confusing collection of attacks on the Department's classification and evaluation procedures, attacks which smell distinctly of red herring. *See* Pl.'s Opp'n Def.'s Mot. Summ. J.

[69-1] 19–26. None of these arguments constitutes evidence that could persuade a reasonable jury that the Department's proffer of non-discriminatory reasons is pretext.

First, Ms. Perry claims that the Department "subjected" Ms. Perry's work to strict evaluations for the sole purpose of keeping her in her GS-12 position, while her white GS-13 "comparators" received no such scrutiny of their positions. *Id.* at 21. She points to a provision of the Foreign Affairs Manual that requires the Department, when initially classifying positions using "evaluation statements"[12] to provide "sufficient detail to enable an individual other than the original classifier to fully understand the basis for the classification determination." *Id.* at 20 (citing 3 Foreign Affairs Manual § 2636.3). Ms. Perry claims that the position descriptions for the GS-13 positions occupied by Mr. DeLeon, Mr. Receveur, and Ms. Thomson show no signs that evaluation statements were prepared at the time the positions were classified. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 21. This is apparently also true for the position description for the GS-12 "Website Manager" position Ms. Perry accepted in 2003. *Id.* Ms. Perry claims that the fact that the Department hasn't produced these evaluation statements shows that it cannot demonstrate how its classification system was working, and that this absence alone shows pretext. *Id.* at 22.

Ms. Perry's argument is unavailing. As a background consideration, a presumption of regularity attaches to agency actions, and courts must presume that public officers have properly discharged their official duties absent clear evidence to the contrary. *U.S. v. Armstrong*, 517 U.S. 456, 464 (1996). The fact that position descriptions from nearly a decade ago do not provide complete information as to how those positions were classified doesn't demonstrate that the Department failed to grade those positions properly or follow its own regulations. Absent

---

[12] Evaluation statements are documents associated with a position description that record a point-based scoring analysis of the position based on various factors. Evaluation statements help others determine how a classifier came up with a classification determination for a particular position.

clearer evidence, the Court must presume that Mr. DeLeon's, Mr. Receveur's, Ms. Thomson's, and Ms. Perry's positions were graded appropriately given the responsibilities that the positions required. The Court has seen nothing in the record indicating that back in 2003, when Ms. Perry received her GS-12 promotion, she objected that her position wasn't properly classified.

Furthermore, Ms. Perry confuses two very different things when she claims that she was subjected to strict evaluations while her "comparators" were not. The positions occupied by Mr. DeLeon, Mr. Receveur, and Ms. Thompson were initially classified by Human Resources as having a GS-13 grade level; these position classification decisions were made before those individuals were hired to fill those positions. Once these persons were hired, their work wouldn't be formally evaluated absent a request for a desk audit. Ms. Perry, by contrast, herself requested the desk audit to which she now claims she was "subjected" by the Department. It was in her interests to do so if she accurately believed that she was performing work above her grade level, as a favorable desk audit would result in an accretion of duties promotion. In short, the scrutiny of Ms. Perry's position and duties is fully explained by *her* decision to seek a Human Resources audit.

Nor does the fact that the Department didn't produce in this litigation the evaluation statements associated with the classification of the positions held by Mr. DeLeon, Mr. Receveur, or Ms. Thomson provide any basis for a reasonable jury to infer pretext for race or sex discrimination on the part of the Department. The absence of these evaluation statements is common to all four individuals, including Ms. Perry. She has provided no evidence that any person neglected to prepare an evaluation statement for the purpose of discriminating against her, or explained how doing so would further some racially-motivated conspiracy directed at her. Furthermore, the Department, under its own regulations, wasn't required to retain such

documents because the positions associated with them were abolished years ago during the reorganization. *See* 3 Foreign Affairs Manual § 2638.3.

For good measure, Ms. Perry also claims that the Department failed to follow other regulations, requiring it to periodically review classification decisions to reduce the likelihood of a drift between workers' actual responsibilities and those recorded in their position descriptions. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 24 (citing 3 Foreign Affairs Manual § 2638.2(a)). The problem, however, is that Ms. Perry has provided no evidence that the Department actually violated these regulations. The regulations at issue require maintenance reviews of position descriptions, but only on a "periodic basis" and only in such a manner that they are accomplished "with minimal adverse impact on normal [IIP] operations." 3 Foreign Affairs Manual § 2638.2(a). Much is left to the Department's discretion. The regulations don't mandate reviews at particular times or when requested by employees such as Ms. Perry. They certainly don't mandate that the Department perform desk audits of individuals named by Ms. Perry after her desk audit produced results with which she was unsatisfied. More importantly, at this time, IIP was undergoing a total reorganization, with many if not all positions being reclassified, so it was perfectly sensible for IIP to defer such maintenance reviews until after the reorganization was completed. Therefore Ms. Perry hasn't shown that the Department violated these regulations, let alone that such a violation shows that its proffer of non-discriminatory reasons is pretext.

In sum, Ms. Perry's numerous and confusing allegations of inconsistencies in the Department's classification and evaluation procedures appears to constitute a smokescreen obscuring a glaring weakness in her case: the fact that the record is devoid of any evidence suggesting intentional discrimination on the part of State Department actors. Therefore Ms. Perry's various claims of regulatory failings by IIP provides no evidence that the Department's

proffer of legitimate, non-discriminatory reasons for the difference in grade level and pay between her and her alleged comparators is pretext for discrimination.

<em>iv.   The Department's "cover-up" of Thomson's desk audit</em>

Ms. Perry's also makes the inflammatory, and unsupported, accusation that that the Department engaged in an "extensive cover-up," hiding "critical pieces of evidence" from EEO investigators in this case, and that this also shows pretext. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 30. The principal piece of evidence referred to is a memorandum related to desk audits of IIP employees. As an initial matter, the Court is unable to locate in the record the memorandum Ms. Perry is talking about, and her Opposition fails to point the Court to the portion of the record containing a copy of it. Apparently this missing memorandum described the results of a desk audit of Paula Thomson's position performed by GraTheryn Weston, the same Human Resources employee who audited Ms. Perry's position in 2005. *See* Def.'s Reply [72] 21. That audit apparently concluded that Ms. Thomson's duties graded at a GS-12 level—a grade lower than her position was currently classified (GS-13). It is unclear, particularly given that Ms. Perry has neglected to show this evidence to the Court, who wrote the memorandum, when it was dated, whether it documented the results of a formal desk audit, such as Ms. Perry received, or an informal one, or even what it said about Ms. Thomson. Ms. Perry claims that the Department intentionally withheld this document from EEO investigators, but she fails to demonstrate that the document was required to be produced to EEO investigators. Certainly, without the document, this Court is unable to determine whether it should have been produced during the EEO investigation. It's not even clear that the document existed at the time of the EEO investigator's requests for production. What is clear, however, is that the memorandum was produced in discovery in *this* lawsuit and Ms. Perry currently has it. If the memorandum is indeed "critical" evidence, Ms. Perry has had it in her possession throughout this litigation and

29

has had the opportunity to use it to her advantage. The fact that the memorandum may not have been produced in an earlier investigation, or that Department witnesses during depositions in this case may not have remembered details from the memorandum, provides no basis for alleging a "cover-up" by the Department. Therefore Ms. Perry's charges of a Department "cover-up," once again, are baseless and fail to rebut the Department's proffered nondiscriminatory reasons for pay disparity between her and her alleged comparators.

<em>v. Weston's use of the "incorrect" classification standard</em>

Ms. Perry also claims that GraTheryn Weston, when she audited Ms. Perry's position in 2005, didn't use the correct classification standard, and that this fact somehow shows that the Department's proffered non-discriminatory reasons for the grade-level disparity between Ms. Perry and her alleged comparators are pretexts for discrimination. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 32. However, even assuming Ms. Perry's premise is true—that Ms. Weston, an African-American female with 20 years' experience performing desk audits for the Department, made errors in Ms. Perry's desk audit—Ms. Perry provides no evidence that these alleged errors were anything other than errors of judgment in what is obviously a technical procedure. There is no evidence that Ms. Weston intentionally selected the wrong classification standard in order to repress Ms. Perry's career, or conspired with others to do so. Ms. Perry has provided no evidence that Ms. Weston was in thrall to the opinion of Mr. Joria or anyone else and incapable of making her own decisions as to Ms. Perry's grade level.

Furthermore, Ms. Perry's repeated criticisms of Ms. Weston's desk audit are highly untimely, as she was given an opportunity in August 2005 to challenge the audit's results in various ways and chose not to do so. Having turned down review at the agency level, Ms. Perry now essentially asks this Court to second-guess a technical Human Resources process when completely adequate review procedures were available to her and she decided not to employ

them. If she believed the audit was flawed, the proper avenue of redress was to seek review within her own agency or through an appeal to the Office of Personnel Management. *Thomas v. Vilsack*, 718 F. Supp. 2d 106, 119 (D.D.C. 2010). Courts should not serve as "super-personnel department[s]," second-guessing agencies' business decisions. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007). Furthermore, even Ms. Perry's own expert testified that supposed mistakes in Ms. Weston's audit, if corrected, wouldn't have changed the audit's results. Def.'s Ex. 8, Gerber Dep. [64-4], at 35–36. Ms. Perry has failed to present evidence that would allow a reasonable jury to conclude that any errors in Ms. Weston's desk audit show that the Department's proffer is pretext for discrimination.

Therefore, because Ms. Perry has failed to produce sufficient evidence for a reasonable jury to find that the Department's asserted non-discriminatory reasons weren't the actual reasons, *Brady*, 520 F.3d at 494, her wage discrimination claim fails as a matter of law.

### b. Absence of evidence of intentional discrimination

Ms. Perry's wage discrimination claim must also be dismissed because she has failed to meet her ultimate burden of showing that a reasonable jury could conclude that she has suffered intentional discrimination. *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999). There is no dispute that the record is devoid of any evidence showing directly that any Department employee in a position of authority over Ms. Perry was biased against her because she was a woman or African American. Nor does any other evidence allow a reasonable inference that behind their actions toward Ms. Perry, discriminatory animus was lurking.

Mr. Joria, her first-line supervisor, is identified repeatedly by Ms. Perry as the person whose alleged racism and sexism is responsible for the difference in pay between Ms. Perry and other website managers in IIP. Yet Mr. Joria played no role in the promotion of Mr. DeLeon,

Mr. Receveur, or Ms. Thomson to the GS-13 level, so it is impossible that he treated them preferentially on account of their being white. Nor is there any evidence that Mr. Joria's disagreement with Ms. Perry about whether she should receive a GS-13 promotion had anything to do with her gender or race. Supervisors often disagree with employees about whether they should get a promotion; often these disagreements reflect honest assessments by supervisors about whether the promotion is deserved or authorized. The fact that other, white employees whom Mr. Joria did not promote held positions one grade level higher than Ms. Perry's says nothing about whether Mr. Joria's views about Ms. Perry's desire for a promotion were motivated by racism or sexism. Ms. Perry's arguments, when the smoke clears, boil down to the spurious claim that her managers racially discriminated against her by refusing to break the rules.

Furthermore, there is significant evidence undermining Ms. Perry's claim that Mr. Joria's behavior was motivated by racism. Mr. Joria's view that Ms. Perry shouldn't receive a GS-13 level promotion was shared by many other people, including persons of the same race and gender as Ms. Perry. Kathleen Davis, who is an African American woman and Mr. Joria's boss, also declined to create a GS-13 position for Ms. Perry. GraTheryn Weston of Human Resources (also an African-American woman), confirmed Mr. Joria's views by concluding through a desk audit that Ms. Perry requested that Ms. Perry barely performed GS-12 level work. Also, a contract classifier with no connection to Ms. Perry at all determined, once again, in 2009, that Ms. Perry's position was properly graded at the GS-12 level. Therefore Mr. Joria's views were corroborated by other persons in the Department who either didn't know Ms. Perry or who Ms. Perry has testified harbored no discriminatory animus toward her. This is not the stuff of which intentional discrimination is made. For intentional discrimination to exist, there must be some human mind or minds that possess discriminatory ideas, and evidence revealing those ideas or their works.

Here, there is nothing but Ms. Perry's bare, uncorroborated allegations, which are not controlling, and certainly not enough to send to a jury.

Therefore Ms. Perry's wage discrimination fails as a matter of law.

### 3. Retaliation

Ms. Perry also claims that the Department retaliated against her in various ways for protected activity. As stated above, Title VII prohibits the federal government from retaliating against employees who complain of employment discrimination. *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008). As is the case with Ms. Perry's Title VII discrimination claim, her retaliation claim must be analyzed under the familiar burden-shifting framework of *McDonnell Douglas*, 411 U.S. at 802–05, as simplified by the D.C. Circuit in *Brady*, 520 F.3d at 494. Once the Department has asserted a legitimate, non-retaliatory reason for its actions, Ms. Perry must present sufficient evidence for a reasonable jury to find that the Department's asserted non-retaliatory reason wasn't the actual reason and the Department intentionally retaliated against her for protected activity. *Jones*, 557 F.3d at 678.

As stated earlier in this opinion, Ms. Perry points to six allegedly retaliatory acts: (1) Mr. Joria's "refus[al] to support her request for a GS-13" promotion; (2) the Department's refusal to increase her pay to match that of "her similarly situated white female co-worker, Paula Thomson"; (3) the Department's denial of her training requests; (4) its stripping-away of some of her duties; (5) its refusal to reclassify her position "to be equal to that of her white male[] co-worker Mr. Larsen"; and (6) its refusal of her request for advanced sick leave.[13] Am. Compl. [21] ¶¶46, 47. The Court will discuss the Department's proffered legitimate, non-retaliatory reason for each of these acts in turn, and Ms. Perry's rebuttals.

---

[13] As stated above, Ms. Perry's retaliation claim related to the alleged denial of her request for sick leave will be dismissed because the record shows that Ms. Perry was not, in fact, denied the sick leave that she requested. Ex. 1, Perry Dep. [64-2], at 195:2–12.

### a. Joria's refusal to support her GS-13 promotion request

Ms. Perry claims that her first-line supervisor, Mr. Joria, retaliated against her when he "refus[ed] to support her request for a GS-13" promotion. Am. Compl. [21] ¶46. The Department argues that Mr. Joria's alleged refusal to assist Ms. Perry in upgrading her position wasn't retaliation for protected activity, but instead stemmed from his adherence to the limitations of the civil service classification system. Def.'s Mot. Summ. J. [64] 29–30. While Mr. Joria appears to have had his doubts about whether Ms. Perry deserved a promotion, he didn't oppose a desk audit and that audit ultimately confirmed his opinion about whether she deserved a promotion. *Id.* at 39.

Ms. Perry's various attempts to rebut this proffered non-retaliatory reason fail. The record is clear that when Ms. Perry first asked Mr. Joria to promote her to a GS-13 in May or June 2004, Ms. Perry's current position was at the full performance level of GS-12—that is, Ms. Perry was ineligible for a promotion to GS-13. Mr. Joria had to tell her no. But he nevertheless discussed with her alternative ways that she could get to the GS-13 level. She could apply for a position with a GS-13 grade level, if it existed, or ask Human Resources to audit her position. Ms. Perry never directly discusses these clear limits on what Mr. Joria would be able to do for her in the summer of 2004. Instead, she makes unsupported allegations that his alleged "bias" "infected" employees in the Human Resources department and interfered with its desk audit process. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 18–19. This is insufficient at the summary judgment stage. Therefore Ms. Perry's efforts to show that the Department didn't give the true reason for Mr. Joria's opposition to her promotion to GS-13 fail and this claim for retaliation will be dismissed.

Alternatively, this retaliation claim will be dismissed for failure to establish a *prima facie* case of retaliation. To make out a *prima facie* case, a plaintiff must show (1) that she engaged in

protected activity, (2) that she suffered a materially adverse action by her employer, and that (3) a causal link connects the two. *Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011). Ms. Perry has failed to establish a causal link between any protected act and Mr. Joria's opposition to her receiving a GS-13 promotion. First, to the extent that she claims that Mr. Joria's reaction to her request for a GS-13 promotion was payback for her 1999 EEO complaint, no causal connection can been inferred from the more than nine months that had passed since Mr. Joria learned that she had filed an EEO complaint against a different person, let alone the more than five years that had passed since that protected activity actually took place. *See Mayers v. Laborers' Health & Safety Fund*, 478 F.3d 364, 369 (D.C. Cir. 2007). Ms. Perry has provided no evidence or argument explaining why Mr. Joria would decide to retaliate against *her* because she filed a complaint against someone else. *See Beiter v. Runyon*, 50 Fed. Appx. 32, 36 (2d Cir. 2002). Furthermore, at Mr. Joria's first opportunity to retaliate against Ms. Perry—his review of her reimbursement requests in August 2003—he did not do so. No reasonable jury could conclude based on these facts that Ms. Perry's 1999 EEO complaint had anything to do with Mr. Joria's behavior when it came to her promotion requests.

To the extent that Ms. Perry claims that Mr. Joria's consistent refusal to simply create a GS-13 position for her represented retaliation for her protected comments, throughout the 2004–2005 period, that she was the victim of discriminatory treatment, the claim still fails because the first instance in the record where Mr. Joria refused Ms. Perry's promotion request was in May or June 2004, which is before the earliest of Ms. Perry's informal comments.[14] Mr. Joria consistently held the same view on the issue, both before and after she engaged in protected activity, such that no causal inference can reasonably be drawn. *See Glass v. Lahood*, No. 08-

---

[14] Her statement in 2005 to Mr. Joria that the inequality in the grade levels of the various Website Managers could "definitely be a race issue," Perry EEO Hearing Testimony [71-7] 268:13–15, came *after* Mr. Joria had already told plaintiff that he wouldn't sign off on a new GS-13 position description for plaintiff.

01516, 2011 WL 1930669, at *30 (D.D.C. May 20, 2011). The temporal proximity of her comments and Mr. Joria's later repetitions of his stance on her promotion therefore provide no inference whatsoever of a causal connection.

Therefore Ms. Perry's claim for retaliation based on Mr. Joria's refusal to support her promotion fails as a matter of law.

### b. The Department's refusal to increase Ms. Perry's grade level to a GS-13

Ms. Perry's rebuttal of the Department's proffer of legitimate, non-retaliatory reasons for its determination that she didn't deserve a GS-13 promotion fails to show that the Department's proffer is pretext for the same reasons that her rebuttal failed in the context of her discrimination claim. Ms. Perry's scattershot charges of procedural failings on the part of the Department fail to discredit the Department's claim that its promotion determination as to Ms. Perry reflected the sincere efforts of multiple decision-makers to implement the Department's merit promotion system.

Alternatively, this retaliation claim fails as well for failure to make out a *prima facie* case of retaliation. Ms. Perry points to various statements she allegedly made to managers and Human Resources personnel between 2004 and 2005 that she believes constitute protected conduct. Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 11. In particular, she says she received an email from GraTheryn Weston on September 8, 2005 notifying her of her "final rejection" for an accretion of duties promotion, which was "a mere six days" after objecting to IIP Deputy Director Kate Yemelyanov that white website managers were being treated more favorably than her. *Id.* at 12. She believes that the close temporal proximity of these comments and the September 8, 2005 denial of her request for a promotion alone provides enough for a reasonable jury to infer a causal link between her protected activity and the Department's alleged retaliation. *Id.* at 12.

36

Close temporal proximity may be enough, in some cases, to establish the required causal connection. However, ordinarily when a plaintiff's only evidence linking protected activities to adverse employment actions is proximity in time, this is insufficient to rebut a defendant's legitimate proffer. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). Furthermore, there can be no inference of causation from temporal proximity when an employer simply carries out, or announces for a second time, an employment decision that was made before an employee engaged in protected activity. *Ransom v. Center for Nonprofit Advancement*, 514 F. Supp. 2d 18, 30 (D.D.C. 2007). Ms. Perry was told of Ms. Weston's initial audit determination in May 2005, when Ms. Weston concluded that Ms. Perry's duties warranted a GS-11 grade level, and Ms. Perry learned of the final, GS-12 determination in August 2005. Ms. Perry has provided no evidence showing that Ms. Weston had knowledge of Ms. Perry's protected comments before the May 2005 audit results, and therefore no reasonable jury could infer that the audit results were somehow payback for protected comments that Ms. Perry had made. Even more, the audit results were *better* for Ms. Perry in August 2005, when she learned that Ms. Weston had determined based on additional information that Ms. Perry's duties barely rated at the GS-12 level. Ms. Weston certainly didn't "retaliate" against Ms. Perry by raising the grade level determined by the desk audit.

Therefore Ms. Perry's claim for retaliation based on the Department's failure to increase her grade level or pay fails as a matter of law.

### c. Denial of training requests

Ms. Perry also fails to rebut the Department's proffer of the legitimate, non-retaliatory reasons why she was denied certain training requests by Mr. Joria. Mr. Joria explained that he denied certain requests Ms. Perry had made for training because the courses she wanted to take weren't relevant to her work, were too expensive compared to others, and would impair the

operations of the office she was working in. Ms. Perry never challenges this proffer, referring only twice in her Opposition to Mr. Joria's denial of her training requests without addressing Mr. Joria's explanations for his decisions. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. [69-1] 16, 43. Therefore, Ms. Perry has failed to present sufficient evidence for a reasonable jury to conclude that the Department's proffered explanation for its denial of her training requests is pretext for improper retaliation.

### d. Loss of duties during the reorganization

Ms. Perry alleges in her complaint that the Department retaliated against her for protected activity by "stripp[ing] her of some of her duties . . . ." Am. Compl. [21] ¶46. The Department produced evidence that each and every change to Ms. Perry's duties was made pursuant to an IIP-wide reorganization that began in 2003, and that those changes affected many IIP website managers, not just Ms. Perry. The Department is not obligated to suspend long-planned changes to its organizational structure because it learns that an employee has filed a discrimination claim. Ms. Perry never addresses the Department's proffer in her Opposition. Therefore, Ms. Perry's claim for retaliation based on the Department's transfer of some of her duties is dismissed.

### e. March 2009 reclassification

While the Court has already dismissed this retaliation claim without prejudice for failure to exhaust administrative remedies, the Court notes that it would have to be dismissed in any case because Ms. Perry has failed to rebut the Department's proffered non-retaliatory explanation for its classification of Ms. Perry's position in 2009 as a GS-12 "Electronic Publishing Specialist." The Department explained that the decision to classify Ms. Perry's position in 2009 as a GS-12 was made by a contract classifier who did not know Ms. Perry or have any knowledge of her protected acts. Def.'s Ex. 23, Cheli Dep. [64-15] 171:5–12. Ms. Perry says nothing in her Opposition to discredit the Department's proffer or otherwise suggest

38

that this contract classifier's decision to grade her position at the GS-12 level had anything to do with retaliation for protected conduct.

Ms. Perry's claim likewise fails because she cannot make out a *prima facie* case of retaliation. This contract classifier didn't know anything about Ms. Perry or her protected conduct, so Ms. Perry cannot establish a causal link between any protected activity and the allegedly retaliatory actions of the contract classifier in grading her position at the GS-12 level.

Therefore Ms. Perry's retaliation claim related to her March 2009 position reclassification will be dismissed.

## IV.   CONCLUSION

For the reasons stated above, the Court will grant defendant's Motion [64] for Summary Judgment and deny plaintiff's Motion [74] for Leave to file a sur-reply, plaintiff's Motion [78] *in Limine*, and defendant's Motion [79] *in Limine* as moot.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on August 29, 2011.